1   Julie Barkema
2   6443 S. Franklin Street
3   Centennial , CO 80121
4

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2010 SEP 13  PM 2: 03

GREGORY C. LANGHAM
CLERK

5   UNITED STATES DISTRICT COURT
6   DISTRICT OF COLORADO

BY_____ DEP. CLK

**Julie  Barkema**

Plaintiff,

vs.

**BAC Home Loans Servicing, LP**

Defendant

Case #  '10 -CV-02220- Reb -KLm

**AMMENDED PETITION FOR**

**TEMPORARY INJUNCTION**

7

8                                   Date:  9 - 13 - 10

9   ** Notice to the court – The only amended section of this petition is the changing of

10  Defednatns name.  Defendant was formerly inputted as Bank Of America, However, after

11  careful consideration, and to avoid confusion, although the same parent company, it should be

12  named BAC Home Loan Servicing, LP**

13

14  Comes now Julie  Barkema , hereinafter referred to as "Petitioner," and moves the court for

15  relief as herein requested:

16                                   **PARTIES**

17  Petitioner is Julie  Barkema ,  6443 S. Franklin Street  Centennial  CO 80121. Currently

18  Known Defendant(s) are/is:  BAC Home Loans Servicing, LP

19                          **STATEMENT OF CAUSE**

20  Petitioner, entered into a consumer contract for the refinance of a primary residence located at

21  6443 S. Franklin Street , hereinafter referred to as the "property."

22  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

23  predatory loan agreement with Defendant.

PRELIMINARY INJUNCTION          1 of 27

24   Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
25   crafted scheme intended to defraud Petitioner.

26   Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
27   of the types of tactics used by Defendants to defraud Petitioner.

28   Defendants charged false fees to Petitioner at settlement.

29   Defendants used the above referenced false fees to compensate agents of Petitioner in order to
30   induce said agents to breach their fiduciary duty to Petitioner.

31   Defendant's attorney caused to be initiated collection procedures, knowing said collection
32   procedures in the instant action were frivolous as lender is estopped from collection procedures,
33   under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
34   the production of the original promissory note alleged to create a debt.

35                                      **IN BRIEF**
36                        *(Non-factual Statement of Posture and Position)*

37   It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
38   making a number of allegations that, outside the context of the current condition of the real
39   estate industry, may seem somewhat outrageous and counter-intuitive.

40   When Petitioner accuses ordinary individuals of acting in concert and collusion with an
41   ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
42   unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
43   people, just doing what they have been trained to do, are out to swindle the poor
44   unsuspecting borrower.

45   The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
46   committed by people acting in concert and collusion, one with the other.  Petitioner has no
47   reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
48   that what they were doing was part of an ongoing criminal conspiracy, only that it was,
49   and they, at the very least, kept themselves negligently uninformed of the wrongs they
50   were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
51   courts, for failure to strictly enforce the consumer protection laws.

52     **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
53          *(General State of the Real Estate Industry)*

54     ### *THE BEST OF INTENTIONS*

55     Prior to the 1980's and 1990's ample government protections were in place to protect
56     consumers and the lending industry from precisely the disaster we now experience.
57     During President Clinton's administration, under the guise of making housing available to
58     the poor, primary protections were relaxed which had the effect of releasing the
59     unscrupulous on the unwary.

60     Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
61     the risk.   Consequently, Americans were engaged in safe and stable home mortgages.
62     With the protections removed, the unscrupulous lenders swooped in and, instead of
63     making loans available to the poor, used the opportunity to convince the unsophisticated
64     American public to do something that had been traditionally taboo; home buyers were
65     convinced to speculate with their homes, their most important investment.

66     BAC Home Loans Servicing, LP, Ameriquest, Countrywide, and many others swooped in and
67     convinced Americans to sell their homes, get out of their safe mortgage agreements, and
68     speculate with the equity they had gained by purchasing homes they could not afford.  Lenders
69     created loans intended to fail as, under the newly crafted system, the Lender profited more
70     from a mortgage default than from a stable loan.

71     Companies cropped up who called themselves banks when, in fact, they were only either
72     subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
73     creating and selling promissory notes.  As will be demonstrated, these companies then
74     profited from the failure of the underlying loans.

75     ### *HOW IT WORKS*

76     Briefly, how it works is this, the Lender would secure a large loan from a large bank,
77     convert that loan into 20 and 30 year mortgages <u>and</u> then sell the promise to pay to an
78     investor.

79     People would set up mortgage companies buy securing a large loan from one of the major
80     banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
81     an Agent would contract with a seller to find a buyer, bring both seller and buyer to a

82   lender who would secure the title from the seller using the borrowed bank funds for that
83   purpose, and then trade the title to the buyer in exchange for a promissory note.

84   The lender then creates a 20 or 30 year mortgage with money the lender must repay within
85   6 months.  As soon as the closing is consummated, the promissory note is sold to an
86   investor pool.

87   Using the instant case as an example, a $226,040.00 note at 5.3323%%  interest over 30
88   years will produce $144,403.37     The lender can then offer to the investor the security
89   instrument (promissory note) at say 50% of it's future value.  The investor will, over the
90   life of the note, less approximately 3.00% servicing fees, realize $225,233.68 .  The lender
91   can then pay back the bank and retain a handsome profit in the amount of $13,125.66.  The
92   lender, however, is not done with the deal.

93   The lender signed over the promissory note to the investor at the time of the trade, but did
94   not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
95   Court addressed this issue and stated that such a transaction was certainly legal.  However,
96   it created a fatal flaw as the holder of the lien document, at time of sale of the security
97   instrument, received consideration in excess of the lien amount.  Since the lien holder
98   received consideration, he could not be harmed.   Therefore the lien became an
99   unenforceable document.

100   This begs the question: if keeping the lien would render it void, why would the lender not
101   simply transfer the lien with the promissory note?  The reason is because the lender will
102   hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
103   amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
104   liability.  The lender, by this maneuver, gets consideration a second time.  And still the
105   lender is not done profiting from the deal.

106   After sale of the promissory note, the lender remains as the servicer for the investor.  The
107   lender will receive 3% of each payment the lender collects and renders to the investor
108   pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
109   that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
110   foreclosure.

111   The lender stands to profit more from a note that is overly expensive, than from a good
112   stable loan.   And where, you may ask, does all this profit come from?  It comes from the

113  equity the borrower had built up in the home.  And still the lender is not finished profiting
114  from the deal.

115  Another nail was driven in the American financial coffin when on the last day Congress
116  was in session in 2000 when restrictions that had been in place since the economic
117  collapse of 1907 were removed.  Until 1907 investors were allowed to bet on stocks
118  without actually buying them.  This unbridled speculation led directly to an economic
119  collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 the
120  unscrupulous lenders got their way on the last day of the congressional session.  Congress
121  removed the restriction banning derivatives and again allowed the practice, this time
122  taking only 8 years to crash the stock market.  This practice allowed the lender to profit
123  further from the loan by betting on the failure of the security instrument he had just sold to
124  the unwary investor, thus furthering the purpose of the lender to profit from both the
125  borrower (consumer) and the investor.

126  The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
127  bailout at the expense of the taxpayer.  The unsuspecting consumer was lulled into
128  accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
129  were acting under the guise of government regulation and, therefore, the borrower had
130  reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
131  protect the consumer from just this kind of abuse were simply being ignored.

132  The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
133  the referral of the client to the lender by a person acting as an agent for the borrower.
134  Hereinafter, the person or entity who receives any portion of the yield spread premium, or
135  a commission of any kind consequent to securing the loan agreement through from the
136  borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
137  law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
138  seeking out a lender for the borrower, would seek the best deal for his client rather than
139  who would pay him the most.  That was the intent, but not the reality.  The reality is that
140  Agents never come away from the table with less than 2% or 3% of the principal.  This is
141  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
142  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
143  product than the borrower qualifies for.  This will generate more profits for the lender and,
144  consequently, for the Agent.

PRELIMINARY INJUNCTION          5 of 27

145   It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
146   the fair market price.  This allows the lender to increase the cost of the loan product and
147   give the impression that the borrower is justified in making the purchase.

148   The lender then charges the borrower an underwriting fee in order to convince the
149   borrower that someone with knowledge has gone over the conditions of the note and
150   certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
151   deception of the borrower by placing undue stress on the borrower to sign the large stack
152   of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to
153   insure the transaction.  This trust is systematically violated for the purpose of taking unfair
154   advantage of the borrower.   The entire loan process is a carefully crafted contrive
155   connivance designed and intended to induce the unsophisticated borrower into accepting a
156   loan product that is beyond the borrowers means to repay.  With all this, it should be a
157   surprise to no one that this country is having a real estate crisis.

158                    **PETITIONER WILL PROVE THE FOLLOWING**
159   Petitioner is prepared to prove, by a preponderance of evidence that:

160   • Lender has no legal standing to bring collection or foreclosure claims against the
161      property;

162   • Lender is not a real party in interest in any contract which can claim a collateral
163      interest in the property;

164   • even if Lender were to prove up a contract to which Lender had standing to enforce
165      against Petitioner, no valid lien exists which would give Lender a claim against the
166      property;

167   • even if Lender were to prove up a contract to which Lender had standing to enforce
168      against Petitioner,  said contract was fraudulent in its creation as endorsement was
169      secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
170      the inducement, fraud in the execution, usury, and breaches of contractual and
171      fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
172      Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
173      Pooled Assets,"  "Trustee or officers of Structured Investment Vehicle,"
174      "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
175      'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or

176   bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
177   pooled together in a trust fund;

178   • Defendants have concocted a carefully crafted connivance wherein Lender
179     conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
180     by inducing Plaintiff to enter into a predatory loan inflated loan product;

181   • Lender received unjust enrichment in the amount of 5% of each payment made late
182     to Lender while Lender and Lender's assigns acted as servicer of the note;

183   • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
184     handling the foreclosure process on a contract Lender designed to have a high
185     probability of default;

186   • Lender intended to defraud Investor by converting the promissory note into a
187     security instrument and selling same to Investor;

188   • Lender intended to defraud Investor and the taxpayers of the United States by
189     withholding the lien document from the sale of the promissory note in order that
190     Lender could then hold the lien for three years, then prepare and file Internal
191     Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
192     and deduct same from Lender's income tax obligation;

193   • Lender defrauded backers of derivatives by betting on the failure of the promissory
194     note the lender designed to default;

195   • participant Defendants, et al, in the securitization scheme described herein have
196     devised business plans to reap millions of dollars in profits at the expense of
197     Petitioner and others similarly situated.

198                    **PETITIONER SEEKS REMEDY**

199   In addition to seeking compensatory, consequential and other damages, Petitioner seeks
200   declaratory relief as to what (if any) party, entity or individual or group thereof is the
201   owner of the promissory note executed at the time of the loan closing, and whether the
202   Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
203   Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
204   alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

205 **PETITIONER HAS BEEN HARMED**

206 Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

207 Such harm and detriment includes economic and non-economic damages, and injuries to
208 Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

209 In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
210 equitable relief requested herein is granted.

211 **STATEMENT OF CLAIM**

212 **DEFENDANTS  LACK STANDING**

213 **No evidence of Contractual Obligation**

214 Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
215 produce said contract.  Even if Defendants produced evidence of the existence of said contract in
216 the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
217 that a contract actually existed at one point in time.  A copy, considering the present state of
218 technology, could be easily altered.  As Lender only created one original and that original was
219 left in the custody of Lender, it was imperative that Lender protect said instrument.

220 In as much as the Lender is required to present the original on demand of Petitioner, there can be
221 no presumption of regularity when the original is not so produced.   In as much as Lender has
222 refused Petitioner's request of the chain of custody of the security instrument in question by
223 refusing to identify all current and past real parties in interest, there is no way to follow said
224 chain of custody to insure, by verified testimony, that no alterations to the original provisions in
225 the contract have been made.   Therefore, the alleged copy of the original is only hearsay
226 evidence that an original document at one time existed.  Petitioner maintains that, absent
227 production of admissible evidence of a contractual obligation on the part of Petitioner,
228 Defendants are without standing to invoke the subject matter jurisdiction of the court.

229 **No Proper Evidence of Agency**

230 Defendants claim agency to represent the principal in a contractual agreement involving
231 Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
232 pronouncement that agency has been assigned by some person, the true identity and capacity of

233   whom has not been established.  Defendants can hardly claim to be agents of a principal then
234   refuse to identify said principal.  All claims of agency are made from the mouth of the agent with
235   no attempt to provide admissible evidence from the principal.

236   Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
237   court.

238   **Special Purpose Vehicle**

239   Since the entity now claiming agency to represent the holder of the security instrument is not the
240   original lender, Petitioner has reason to believe that the promissory note, upon consummation of
241   the contract, was converted to a security and sold into a special purpose vehicle and now resides
242   in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue
243   Code and as such, cannot be removed from the REMIC as such would be a prohibited
244   transaction.    If the mortgage was part of a special purpose vehicle and was removed on
245   consideration of foreclosure, the real party in interest would necessarily be the trustee of the
246   special purpose vehicle.  Nothing in the pleadings of Defendants indicates the existence of a
247   special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
248   cause to believe defendant is not the proper agent of the real party in interest.

249   *CRIMINAL CONSPIRACY AND THEFT*

250   Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
251   a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of
252   negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
253   acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
254   Petitioner by Lender, which were then used to fund the improper payment of commission fees to
255   Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

256   *AGENT PRACTICED UP-SELLING*

257   By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so
258   doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
259   that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose
260   Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to
261   Petitioner and the duty to provide fair and honest services, through a series of carefully crafted

262  connivances, wherein Agent proactively made knowingly false and misleading statements of
263  alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
264  Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
265  a loan product offered by the Lender.  Said loan product was more expensive than Petitioner
266  could legally afford. Agent acted with full knowledge that Petitioner would have made a
267  different decision had Agent given complete disclosure.

268  ***FRAUDULENT INDUCEMENT***

269  Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
270  known, Petitioner could not afford in order to unjustly enrich Lender.

271  ***EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT***

272  Said more expensive loan product was calculated to produce a higher return when sold as a
273  security to an investor who was already waiting to purchase the loan as soon as it could be
274  consummated.

275  **Extra Commission for Late Payments**

276  Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
277  that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
278  the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
279  borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
280  Thereby, the Lender stands to receive more than double the regular commission on collections if
281  the borrower pays late.

282  **Extra Income for Handling Foreclosure**

283  Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
284  on which Lender intended petitioner to default.  In case of default, the Lender, acting as servicer,
285  receives considerable funds for handling and executing the foreclosure process.

286  **Credit Default Swap Gambling**

287  Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
288  default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
289  designed the loan to fail, betting on said failure is essentially a sure thing.

290   **_LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN_**

291   Lender sold the security instrument after closing and received consideration in an amount in
292   excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
293   security instrument, Lender separated the lien from said security instrument, creating a fatal and
294   irreparable flaw.

295   When Lender received consideration while still holding the lien and said consideration was in
296   excess of the amount of the lien, Lender was in a position such that he could not be harmed and
297   could not gain standing to enforce the lien. The lien was, thereby, rendered void.

298   Since the separation of the lien from the security instrument creates such a considerable concern,
299   said separation certainly begs a question: "Why would the Lender retain the lien when selling the
300   security instrument?"

301   When you follow the money the answer is clear. The Lender will hold the lien for three years,
302   then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
303   the full amount from Lender's tax liability, thereby, receiving consideration a second time.

304   Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
305   lien to the holder of the security, however, the lien once satisfied, does not gain authority just
306   because the holder, after receiving consideration, decides to transfer it to someone else.

307   **_LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES_**

308   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
309   information that Lender had as a result of creating the faulty loans sure to default. Lender was
310   then free to invest on the bet that said loan would default and stood to receive unjust enrichment
311   a third time. This credit default swap derivative market scheme is almost totally responsible for
312   the stock market disaster we now experience as it was responsible for the stock market crash in
313   1907.

314   **_LENDER CHARGED FALSE FEES_**

315   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
316   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
317   vendor.

PRELIMINARY INJUNCTION            11 of 27

318  Lender charged other fees that were a normal part of doing business and should have been
319  included in the finance charge.

320  Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
321  did Lender or Trustee provide documentation to show that the fees herein listed were valid,
322  necessary, reasonable, and proper to charge Petitioner.

| | |
|---|---|
| 801 Loan Origination Fee | $2,000.00 |
| 804 Credit Report Fee | $12.75 |
| 808 Processing Fee | $787.00 |
| 809 Administration Fee | $250.00 |
| 811 Administration Fee | $250.00 |
| 812 Wire MERS fee | $22.50 |
| 813 Price adjustment fee | $456.60 |
| 901 Interest from 03/17/09  to 04/01/09 @ $29.42 /day ( 15 days) | $441.30 |
| 902 Mortgage Insurance Premium for months to | $3,340.50 |
| 1001 Hazard Insurance | $956.25 |
| 1004 County Property Taxes | $985.44 |
| 1101  Settlement fee | $200.00 |
| 1106 Presentation fee | $240.00 |
| 1108 Title insurance fee | $740.00 |
| 1112 Fed ex courier fee | $60.00 |
| 1201 Recording Fee | $147.00 |

323  Debtor is unable to determine whether or not the above fees are valid in accordance with the
324  restrictions provided by the various consumer protection laws.  Therefore, please provide; a
325  complete billing from each vendor who provided the above listed services; the complete contact
326  information for each vendor who provided a billed service; clearly stipulate as to the specific
327  service performed; a showing that said service was necessary; a showing that the cost of said
328  service is reasonable; a showing of why said service is not a regular cost of doing business that
329  should rightly be included in the finance charge.

PRELIMINARY INJUNCTION          12 of 27

330    The above charges are hereby disputed and deemed unreasonable until such time as said charges
331    have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
332    restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

333    In the event lender fails to properly document the above charges, borrower will consider same as
334    false charges. The effect of the above amounts that borrower would pay over the life of the note
335    will be an overpayment of $93,955.97  This amount will be reduced by the amount of items
336    above when said items are fully documented.

337    ***RESPA PENALTY***

338    From a cursory examination of the records, with the few available, the apparent RESPA
339    violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
340    Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
341    presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
342    No 1st Payment Letter.

343    The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
344    Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
345    statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
346    disclosure letter; loan discount fee disclosure; business insurance company arrangement
347    disclosure; notice of right to rescind.

348    The courts have held that the borrower does not have to show harm to claim a violation of the
349    Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
350    in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
351    no more than two thousand, considering the large number enumerated here, it is reasonable to
352    consider that the court will assess the maximum amount for each violation.

353    Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
354    the note, borrower has calculated that, the number of violations found in a cursory examination
355    of the note, if deducted from the principal, would result in an overpayment on the part of the
356    borrower, over the life of the note, of $153,164.88.

357    If the violation penalty amounts for each of the unsupported fees listed above are included, the
358    amount by which the borrower would be defrauded is $163,242.73

359    Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
360    variance, it appears that lender intended to defraud borrower in the amount of $458,884.65

### LENDER CONSPIRED WITH APPRAISER

361

362  Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
363  purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
364  duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
365  inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
366  Petitioner.

### LENDER CONSPIRED WITH TRUSTEE

367

368  Lender conspired with the trust Agent at closing to create a condition of stress for the specific
369  purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
370  fully understand what was being signed.

371  The above referenced closing procedure was a carefully crafted connivance, designed and
372  intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
373  to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
374  did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
375  as required by various consumer protection statutes.

### DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES

376

377  In the manner in which Defendants have carried on their business enterprises, they have engaged
378  in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
379  (Deceptive Practices Act).

380  Such conduct comprises a pattern of business activity within the meaning of such statutes, and
381  has directly and proximately caused Petitioner to suffer economic and non-economic harm and
382  detriment in an amount to be shown according to proof at trial of this matter.

### EQUITABLE TOLLING FOR TILA AND RESPA

383

384  The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
385  Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

386  Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
387  *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
388  are subject to a one-year limitations period; however, such claims are subject to the equitable

PRELIMINARY INJUNCTION          14 of 27

389  tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
390  subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
391  that given the remedial purpose of TILA, the limitations period should run from the date of
392  consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
393  circumstances, suspend the limitations period until the borrower discovers or has reasonable
394  opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King
395  v. California, 784 F.2d 910, 915* 9th Cir. 1986).

396  Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
397  anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
398  that such limitations period may be equitably tolled. The Court of Appeals for the District of
399  Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &
400  Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
401  opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th
402  Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
403  that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.
404  Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,
405  700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
406  interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
407  language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
408  of precedential value, this Court has previously found both the TILA and **RESPA** limitations
409  periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504
410  F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

411  The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
412  by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
413  existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d
414  409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
415  Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
416  any wrongful conduct by the Defendants. *Santa Maria.* at 1178.

417    **BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING**
418    **STANDARDS**

419    Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
420    assets by, for example, providing W-2 statements, tax returns, bank statements, documents
421    evidencing title, employment information, and other information and documentation that could
422    be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
423    ability to repay a particular loan over both the short and long term. Defendants deviated from and
424    disregarded these standards, particularly with regard to its riskier and more profitable loan
425    products.

426    **Low-Documentation/No-Documentation Loans.**

427    Driven by its desire for market share and a perceived need to maintain competitiveness with the
428    likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
429    documentation loan products, including the ARMs and HELOCs described hereinabove, and
430    began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
431    the already eased underwriting standards to the point of disregarding such standards. This
432    quickened the loan origination process, allowing for the generation of more and more loans
433    which could then be resold and/or securitized in the secondary market.

434    Defendants marketed no-documentation/low-documentation loan programs that included ARMs
435    and HELOCs, among others, in which loans were given based on the borrower's "stated income"
436    or "stated assets" (SISA) neither of which were verified. Employment was verbally confirmed, if
437    at all, but not further investigated, and income, if it was even considered as a factor, was to be
438    roughly consistent with incomes in the types of jobs in which the borrower was employed. When
439    borrowers were requested to document their income, they were able to do so through information
440    that was less reliable than in a full-documentation loan.

441    For stated income loans, it became standard practice for loan processors, loan officers and
442    underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated
443    income loans, emphasizing loan origination from a profitability standpoint at the expense of
444    determining the ability of the borrower to repay the loan from an underwriting standpoint,
445    encouraged the overstating and/or fabrication of income.

446    **Easing of Underwriting Standards**

PRELIMINARY INJUNCTION            16 of 27

447   In order to produce more loans that could be resold in the secondary mortgage market,
448   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
449   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
450   the base FICO score needed for a SISA loan.

451   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
452   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
453   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
454   income ratios (the amount of monthly income compared to monthly debt service payments and
455   other monthly payment obligations.

456   With respect to ARMS, Defendants underwrote loans without regard to the borrower's long-term
457   financial circumstances, approving the loan based on the initial fixed rate without taking into
458   account whether the borrower could afford the substantially higher payment that would
459   inevitably be required during the remaining term of the loan.

460   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
461   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
462   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
463   interest payments.

464   As Defendants pushed to expand market share, they eased other basic underwriting standards.
465   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
466   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
467   eased underwriting standards the Defendants also were encouraging consumers to go further into
468   debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
469   underwriting standards created the aftermarket supply they needed. As a result, the Defendants
470   made it easy for the unwary consumer to take on more debt than he could afford by encouraging
471   unsound financial practices, all the while knowing defaults would occur more and more
472   frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
473   standards.

474   Defendants knew, or in the exercise of reasonable care should have known, from its own
475   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
476   loans that were likely to end up in default. However, as the pressure mounted to increase market
477   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed

PRELIMINARY INJUNCTION            17 of 27

478    underwriting guidelines. Such was the environment that loan officers and underwriters were,
479    from time to time, placed in the position of having to justify why they did not approve a loan that
480    failed to meet underwriting criteria.

481    **Risk Layering**

482    Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
483    loans with one or more relaxed underwriting standards.

484    Defendants knew, or in the exercise of reasonable care should have known, that layered risk
485    would increase the likelihood of default. Among the risk layering Defendants engaged in were
486    approving ARM loans with little to no down payment, little to no documentation, and high
487    DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
488    the loans it promoted to borrowers.

489    Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
490    mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
491    believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
492    business ignored basic established underwriting standards and acted to mislead the borrower, all
493    to the detriment of the borrower and the consumer of loan products..

494    Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
495    engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
496    business practices described above in paragraphs 30-42 of this Complaint

497    *UNJUST ENRICHMENT*

498    Petitioner is informed and believes that each and all of the Defendants received a benefit at
499    Petitioner's expense, including but not limited to the following: To the Agent, commissions,
500    yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
501    be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
502    surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
503    resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
504    percentages of payment proceeds, charges, and other "back end" payments in amounts to be
505    proved at trial; To all participants, the expectation of future revenues from charges, penalties and
506    fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

507  By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
508  and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
509  deprived, and is entitled to restitution in the amount of $458,884.65

510  ### *CLAIM TO QUIET TITLE.*

511  Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
512  the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
513  interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
514  and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

515  Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
516  power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
517  interest in the Subject Property has been rendered void and that the Defendants are not the holder
518  in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
519  involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

520  "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
521  scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
522  *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
523  *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
524  *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
525  *Rptr. 2d 752 (2d Dist. 1995).*

526  ### *SUFFICIENCY OF PLEADING*

527  Petitioner has sufficiently pled that relief can be granted on each and every one of the
528  Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
529  doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
530  entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
531  allegations of material fact in the complaint are taken as true and construed in the light most
532  favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

533  Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
534  8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
535  theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
536  *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal

537 conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court

538 should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,

539 Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of

540 their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,

541 relief as requested herein should be granted.

542                                    **CAUSES OF ACTION**

543        ***BREACH OF FIDUCIARY DUTY***

544 Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary

545 duty of care with respect to the mortgage loan transactions and related title activities involving

546 the Trust Property.

547 Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such

548 breaches included, but were not limited to, ensuring their own and Petitioners' compliance with

549 all applicable laws governing the loan transactions in which they were involved, including but

550 not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

551 Defendant's breaches of said duties were a direct and proximate cause of economic and non-

552 economic harm and detriment to Petitioner(s).

553 Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,

554 all to be shown according to proof at trial of this matter.

555        ***CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE***

556 Defendants owed a general duty of care with respect to Petitioners, particularly concerning their

557 duty to properly perform due diligence as to the loans and related transactional issues described

558 hereinabove.

559 In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations

560 X and Z promulgated there under to, among other things, provide proper disclosures concerning

561 the terms and conditions of the loans they marketed, to refrain from marketing loans they knew

562 or should have known that borrowers could not afford or maintain, and to avoid paying undue

563 compensation such as "yield spread premiums" to mortgage Agents and loan officers.

564    Defendants knew or in the exercise of reasonable care should have known, that the loan
565    transactions involving Petitioner and other persons similarly situated were defective, unlawful,
566    violative of federal and state laws and regulations, and would subject Petitioner to economic and
567    non-economic harm and other detriment.

568    Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
569    Z promulgated there under were intended and designed to protect, and the conduct alleged
570    against Defendants is the type of conduct and harm which the referenced statutes and regulations
571    were designed to deter.

572    As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
573    non-economic harm in an amount to be shown according to proof at trial.

574    ### *AGENT: COMMON LAW FRAUD*

575    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
576    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
577    ground for believing them to be true.

578    Agents made these representations with the intention of inducing Petitioner to act in reliance on
579    these representations in the manner hereafter alleged, or with the expectation that Petitioner
580    would so act.

581    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
582    in their negligent misrepresentation, and that various Agents were negligent in not implementing
583    procedures such as underwriting standards oversight that would have prevented various Agents
584    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
585    Defendants.

586    Petitioner is informed and believes that Agent acted in concert and collusion with others named
587    herein in promulgating false representations to cause Petitioner to enter into the LOAN without
588    knowledge or understanding of the terms thereof.

589    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
590    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
591    opportunities, attorney fees and costs, and other damages to be determined at trial. As a
592    proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has

593   suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and

594   mental and physical pain and anguish, all to Petitioner's damage in an amount to be established

595   at trial.

### PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

596

597

598   Petitioner properly pled Defendants violated the breach of implied covenant of good faith and

599   fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its

600   performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*

601   *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

602   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*

603   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

604   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a

605   particular significance, in part because of the special relationship between the insurer and the

606   insured. The insurer, when determining whether to settle a claim, must give at least as much

607   consideration to the welfare of its insured as it gives to its own interests. . . The standard is

608   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

609   Likewise, there is a special relationship between an Agent and borrower. "A person who

610   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or

611   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the

612   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may

613   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in

614   *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*

615   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."

616   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).

617   [*Emphasis Added*].

618   All Defendants, willfully breached their implied covenant of good faith and fair dealing with

619   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to

620   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan

621   product without regard for other more affordable products; (4) Placed Petitioner into a loan

622   without following proper underwriting standards; (5) Failed to disclose to Petitioner that

623   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform

624    valid and /or properly documented substitutions and assignments so that Petitioner could
625    ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
626    request for documentation of the servicing of Petitioner's loan and the existence and content of
627    relevant documents. Additionally, Defendants breached their implied covenant of good faith and
628    fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
629    right under an alleged power of sale because the purported assignment was not recorded and by
630    willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
631    special relationship inherent in a real estate transaction between Agent and borrower, *and* all
632    Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

633    ### *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
634    ### *SEQ*

635    Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
636    contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
637    Action as though the same were set forth herein.

638    Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
639    the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
640    Property, and entitles Petitioner to damages as proven at trial.

641    ### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

642    The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
643    highly leveraged and vulnerable consumers who placed their faith and trust in the superior
644    knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
645    civilized society.

646    Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
647    distress, or acted in conscious and/or reckless disregard of the probability that such distress
648    would occur.

649    Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
650    conduct of Defendants as described hereinabove.

651    As a result of such severe emotional distress, Petitioner suffered economic and non economic
652    harm and detriment, all to be shown according to proof at trial of this matter.

653  Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
654  Petitioner and secure to Petitioner quite title;

655  Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
656  as payments to Defendants based on the fraudulently secured promissory note in an amount to be
657  calculated by Defendants and verified to Petitioner;

658  Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
659  amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
660  equal to $1,376,653.95

## REQUEST FOR TEMPORARY INJUNCTION

661

662  Plaintiff will suffer imminent and irreparable injury if defendant is not enjoined from
663  foreclosing on the property owned by Plaintiff. Fed. R. Civ. P. 65(b)(1); *see Sampson v. Murray*,
664  415 U.S. 61, 88-89 & n.59, 94 S. Ct. 937, 951-52 & n.59 (1974).

665  There is no adequate remedy at law because once the foreclosure sale has taken place
666  Plaintiff will suffer the complete loss of the property as defendant will sell the property to a third
667  party who will have a right to possession without regard to the claims Plaintiff has against
668  defendant. {*See N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306, 105 S.*
669  *Ct. 459, 459 (1984); Wilson v. Ill. S. Ry. Co., 263 U.S. 574, 576-77, 44 S. Ct. 203, 203-04*
670  *(1924); Winston v. Gen. Drivers, Warehousemen & Helpers Local Un. No. 89, 879 F. Supp. 719,*
671  *725 (W.D. Ky. 1995.*

672  There is a substantial likelihood that plaintiff will prevail on the merits. *Schiavo v. Schiavo*,
673  403 F.3d 1223, 1225 (11th Cir. 2005). Plaintiff will be able to show that:

674  Defendant has no agency to represent the real party in interest;

675  • that the alleged real party in interest is unable to prove standing foreclose against and
676  sell the property;

677  • that the lender committed numerous acts, as listed above, that have the effect of
678  rendering the contract, through which defendant claims authority, void and
679  unenforceable.

680  The threatened harm to plaintiff outweighs the harm that a preliminary injunction would
681  inflict on defendant. *Schiavo*, 403 F.3d at 1225-26. If defendant is temporarily restrained from

PRELIMINARY INJUNCTION

682  selling the instant property, the defendant and plaintiff will benefit as if plaintiff is forced to
683  vacate the property, the property will sit empty for the duration of the action. Plaintiff will suffer
684  loss of the use of said property and will loose opportunity to maintain same and defendant will
685  suffer loss by having to maintain an empty property that cannot be insured.

686      Issuance of a preliminary injunction would not adversely affect the public interest and public
687  policy because there are already a great number of empty houses with the current residential
688  foreclosure mess. Adding more will simply increase the burden on the local as it will create
689  opportunity for vandalism and further other criminal activity.

690      Plaintiff is willing to post a bond in the amount the court deems appropriate.

691      The court should enter this preliminary injunction without notice to defendant because
692  plaintiff will suffer immediate and irreparable injury, loss, or damage if the order is not granted
693  before defendant can be heard. *First Tech. Safety Sys. v. Depinet*, 11 F.3d 641, 650 (6th Cir.
694  1993). If said sale is allowed to take place, Plaintiff will be irreparably harm.   {*See O'Connor's
695  Federal Rules, "Ex parte," ch. 2-D, §3.1.3, p. 77.*}

696      Plaintiff asks the court to set the request for a preliminary injunction for hearing at the
697  earliest possible time.

698                                    **CONCLUSION**
699

700      13. Plaintiff has filed suit against defendant wherein Plaintiff has claimed numerous causes
701  of action against defendant. A number of the allegations made by Plaintiff are incontrovertable
702  by defendant, therefore, Plaintiff will prevail on a number of the above allegations by way if
703  existing records. For these reasons, plaintiff asks the court to issue a preliminary injunction
704  preventing defendant from foreclosing on the property.

705                                      **PRAYER**
706

707      15. For these reasons, plaintiff asks that the court do the following:

708      a.   Defendant be prevented from foreclosing on and selling the property until and
709           unless defendant prevails in the current litigation.

PRELIMINARY INJUNCTION            25 of 27

710          b.   Enter judgment for plaintiff.

711          c.   Award costs of court.

712          d.   Grant any other relief it deems appropriate.

713   **Respectfully Submitted,**
714
715
716   **Julie  Barkema**
717

# VERIFICATION

718

719

720

721   I, Julie Barkema , do swear and affirm that all statements made herein are true and accurate, in
722   all respects, to the best of my knowledge.

723   Julie  Barkema
724   6443 S. Franklin Street
725   Centennial , CO
726

727   The Person above, who proved to me on the basis of satisfactory evidence to be the person

728   whose name is subscribed to this document and acknowledged to me that he/she executed the

729   same in his authorized capacity and that by his signature on this instrument who is the person

730   who executed this instrument.

731   I certify under PENALTY OF PERJURY under the laws of this State that the foregoing

732   paragraph is true and correct.

733

734   Witness my hand and official seal.

735

736   _____   Exp 10 -30-2013

737   **NOTARY PUBLIC IN AND FOR**                    Notary Seal

738   **THE STATE OF COLORADO**

739